# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| A residence located at 130 S Coronado Street, Apt 107, Los Angeles, CA 90057 | )   Case No. **2:24-MJ-04170** |
| | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1028A, 1029, 1030, 1343, 1344, 1956 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Jarred Medenwald*
_____
*Applicant's signature*

Jarred Medenwald, USSS Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>         Hon. Pedro V. Castillo, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Joseph De Leon (x7280)

**<u>ATTACHMENT A-1</u>**

<u>PREMISES TO BE SEARCHED</u>

The following premises (the "SUBJECT PREMISES"), as depicted in the photograph below, located at 130 S Coronado St, Apt 107, Los Angeles, CA 90057: a three-level apartment complex with a red/brown brick exterior consisting of multiple units. The front entrance of the unit has "107" affixed to the top of the door: (a) all rooms inside unit #107; (b) any digital devices found at the SUBJECT PREMISES; and (c) and any and all storage units, containers, attachments, attics, safes, carports, garages, vehicles, outbuildings, and all other areas within the curtilage.




i

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence of violations of Title 18, United States Code, 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 1030 (Computer Fraud and Abuse), 1343 (Wire Fraud), 1344 (Bank Fraud), and 1956 (Money Laundering) (the "Subject Offenses") namely:

   a.   Records and information that tend to show dominion and control of the SUBJECT PREMISES and SUBJECT VEHICLE.

   b.   Access devices, EBT card information, records and information related to any victims or potential victims of fraud;

   c.   Products and goods suspected to be purchased using EBT cards for resale, including but not limited to bulk product known to be purchased by RAMIREZ during the fraud scheme such as protein powder or Liquid IV;

   d.   U.S. currency over $1,000, receipts from money services bureaus, money orders, cashier's checks, prepaid gift cards, and any other cash equivalent capable of being used in the laundering/conversion of proceeds of the crime;

   e.   Virtual currency and related records of any kind, to include: any and all representations of virtual currency public keys or addresses, whether in electronic or physical format; any and all representations of virtual currency private keys, whether in electronic or physical format; any and all representation of virtual currency wallets or their constitutive

iv

parts, whether in electronic or physical format, to include recovery leys which may be used to regenerate a wallet.

f.   Records and information relating to any bank accounts, EBT accounts, credit card accounts, debit card accounts, cryptocurrency accounts, or other financial accounts;

g.   Records or information relating to obtaining, possessing, using, or transferring personal and/or financial information for persons other than RAMIREZ, such as names, addresses, phone numbers, EBT account numbers, bank account and other financial institution account numbers, credit and debit card numbers, Social Security numbers, email addresses, IP addresses, home addresses, security codes, PIN numbers, and passwords for financial institutions, telephone providers, or internet service providers;

h.   Records and information related to the purchase, sale, and use of EBT, credit and debit cards;

i.   Records and information related to the use of, or access to, the Dark Web or other websites to acquire others' personal identifying information or means of payment, including but not limited to, EBT, credit or debit cards numbers, or other fraud-based activities;

j.   Records and information related to the storage, whereabouts, or location where money is being stored, laundered, or hidden;

k.   Records and information related to banking, finance, financial institutions, and any financial transactions, including wire transfers and the use of cryptocurrency;

l.    Information relating to the laundering of funds obtained from fraud schemes;

m.    Information in any format pertaining to address books, contacts, electronic mail, telephone numbers, or account information, which may relate in relevant part to any personal information associated with the victims in the present investigation;

n.    Information relating to co-conspirators, including information relating to their identities, whereabouts, communications, and methods of contact and communication;

o.    Contents of any calendar or date book stored on any of the digital devices;

p.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

q.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

r.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

s.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations; q. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

t.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof;

u.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, contact information, telephone records, geospatial information, electronic or digital currency applications and exchanges, cloud accounts or remote accounts where an individual might remotely store, save, or preserve digital information relevant to the scope of this warrant for purposes of saving that information remotely from the device's

local and native memory storage, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate, obfuscate, or otherwise hide data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses to include SIM card information, International Mobile Equipment Identity Number (IMEI) associated with the device, any Media Access Control Address (MAC address) associated with or used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; universal serial bus (USB) device in any physical format or configuration; and digital storage device (SD Card); personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.  In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will transport the devices to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital devices and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit) and Cellebrite and other related forensic software and hardware related to the forensic acquisition and analysis of computers, laptops, mobile phones, USB and media card devices, and other digital devices subject to the scope of this warrant, which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the

other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress RAMIREZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of RAMIREZ's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain

access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Jarred Medenwald, being duly sworn, declare and state as follows:

### I.  <u>INTRODUCTION</u>

1.   I am a Special Agent with the United States Secret Service ("USSS") and have been so employed since May 2016. I am currently assigned to the Homeland Security Investigations ("HSI") El Camino Real Financial Crimes Taskforce in Los Angeles, CA.

2.   In becoming a Special Agent, I have completed criminal investigative training, including the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the USSS Special Agent Training Course at the James J. Rowley Training Center in Beltsville, Maryland. I have attended multiple advanced and in-service trainings regarding the investigation of cyber-enabled financial crimes, including the Basic Investigation of Computer and Electronic Crimes, Network Intrusion Triage and Response, and training regarding money laundering and asset forfeiture.

3.   During my tenure as a Special Agent with USSS, I have investigated and arrested numerous individuals for federal felony offenses including wire fraud, bank fraud, identity theft, money laundering, and access device fraud, among other offenses. During these investigations, I have personally obtained or participated in the execution of several search and seizure warrants for suspect premises and electronic devices.

## II. <u>PURPOSE OF AFFIDAVIT</u>

4.    This affidavit is made in support of applications to search the following:

      a.   A residence located at 130 S Coronado Street, Apt 107, Los Angeles, CA 90057, which is known to be Gerardo N RAMIREZ's ("RAMIREZ") primary residence (the "SUBJECT PREMISES"), as described more fully in Attachment A-1.

      b.   The person of RAMIREZ, as described more fully in Attachment A-2.

      c.   A 2023 black Mercedes Benz with four doors bearing California license plate number 9GDK327 and with vehicle identification number W1KEG2BB8PF014172 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-3, which is registered to RAMIREZ at the SUBJECT PREMISES.

5.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), 1030 (Computer Fraud and Abuse), 1343 (Wire Fraud), 1344 (Bank Fraud), and 1956 (Money Laundering) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants

2

and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times listed are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.    In or about June 2024, law enforcement learned that RAMIREZ was involved in the fraudulent use of Electronic Benefit Transfer ("EBT") cards to conduct unauthorized purchases of products from Costco warehouses throughout the Central District of California.

8.    According to records from Costco, RAMIREZ has used approximately 577 unique EBT card numbers to conduct these unauthorized purchases. From on or about September 29, 2023, to on or about April 20, 2024, RAMIREZ conducted approximately $554,827 in apparent unauthorized purchases.

9.    All of the approximately $554,827 in unauthorized purchases using victim EBT cards were made using Costco memberships which list RAMIREZ as the Costco member and provide a picture of RAMIREZ.

10.   The approximately 577 unique EBT card numbers used by RAMIREZ resolve to 11 different states according to the bank identification number ("BIN"), or the first six digits, of the EBT card numbers. For example, the EBT card BIN for California is 507719. Of the approximately 577 unique EBT card numbers used by RAMIREZ, approximately 244 are California EBT cards. The remaining EBT cards used by RAMIREZ resolve to Illinois,

Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, North Carolina and Texas.

11.   RAMIREZ can be seen on surveillance video as recently as on or about April 20, 2024 at Costco warehouses throughout the Central District of California making unauthorized purchases using victim EBT cards. RAMIREZ has also been observed on surveillance provided by Costco driving the SUBJECT VEHICLE in the parking lot.

12.   Most of the unauthorized purchases conducted by RAMIREZ were for large amounts protein powder and Liquid IV, which are authorized to be purchased using benefits disbursed to EBT cards. These benefits are designed to assist low-income individuals or households in purchasing groceries and other authorized necessities.

13.   Based upon my conversations with representatives at Amazon, I know that RAMIREZ has an Amazon seller account which has been active since in or about December 2022. Based upon Wells Fargo records, RAMIREZ has received deposits into his Wells Fargo bank accounts from Amazon totaling approximately $599,200.

14.   Law enforcement learned from the property management for the SUBJECT PREMISES that RAMIREZ had a large number of boxes and shipping labels stacked throughout the SUBJECT PREMISES on or about July 2, 2024.

### IV. STATEMENT OF PROBABLE CAUSE

15.   Since in or about June 2024, the USSS and HSI have been investigating RAMIREZ for the unauthorized use of hundreds

of victim EBT cards from at least 11 different states at Costco warehouses throughout the Central District of California.

16.   Each state administers its own EBT program and sets qualification standards for individuals and households to apply for different benefit programs, such as benefits through the Supplemental Nutrition Assistance Program ("SNAP"). Some states may refer to SNAP assistance using other program names, such as California which refers to its food assistance program as "CalFresh" according to the California Department of Social Services.

a.   Benefits disbursed to EBT cardholders are generally intended to aid individuals or households who meet certain income criteria, are unemployed, or who otherwise demonstrate a financial need for assistance.

b.   Benefits disbursed to EBT cardholders for food assistance, such as SNAP, are only able to be spent at certain authorized merchants and on certain food related items. For example, an authorized use of SNAP benefits disbursed to an EBT card would be purchasing groceries from a Costco or Walmart, but you could not purchase electronics or alcohol.

17.   Based on my training and experience investigating EBT fraud schemes, I know that suspects involved in the unauthorized use of stolen EBT card information will sometimes purchase SNAP eligible items in bulk in order to resell those items, thereby monetizing the stolen benefits.

18.   According to records from Costco, beginning on or about September 29, 2023 and continuing through on or about

April 20, 2024, RAMIREZ conducted more than approximately 640 purchases at approximately 29 Costco warehouses throughout the Central District of California.

19.  According to records from Costco, to conduct these purchases, RAMIREZ used approximately 577 unique EBT card numbers from 11 different states including California. Aside from California, the EBT cards used by RAMIREZ resolve to (according to the BIN on the EBT cards) Illinois, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, New York, North Carolina and Texas.

20.  According to records from Costco, these unauthorized purchases conducted by RAMIREZ using the approximately 577 unique EBT cards amount to approximately $554,827.

21.  In order to shop at Costco, individuals must become a member by providing basic biographical information and paying for a membership. When you become a Costco member, you are provided with a membership ID card which displays your photo on the card.

22.  According to records from Costco, all of the unauthorized purchases conducted by RAMIREZ at Costco were made under five different Costco membership profiles bearing the membership numbers 111981147589, 111982232727, 111982597768, 111994757867 and 111941012356.

    a.  The photo associated with all five of the Costco membership profiles is RAMIREZ.

b.   All five Costco memberships list Gerardo RAMIREZ as the member name. Membership number 111941012356 also lists RAMIREZ's mother as a household member.

c.   The full address for the SUBJECT PRESMISES is provided on all but one of the membership profiles, membership number 111982597768, which lists the same street address but omits the apartment number.

23.   While surveillance is not available from Costco for each and every of the more than 640 purchases conducted by RAMIREZ, law enforcement has reviewed surveillance for purchases dating back to on or about March 29, 2024 and determined that RAMIREZ is the individual conducting all of the unauthorized purchases for which surveillance has been reviewed.

24.   For example, law enforcement reviewed surveillance provided by Costco which shows RAMIREZ conducting four separate transactions on or about March 29, 2024 totaling approximately $5,017 at two Costco warehouses in Pacoima, CA and Burbank, CA. According to surveillance and transaction data, RAMIREZ used a California EBT card ending in 7453 at four separate checkout registers to conduct these purchases, which were for large amounts of protein powder.

25.   EBT card ending in 7453 belongs to victim J.S. of Downey, CA, who, when interviewed by law enforcement, confirmed they did not give RAMIREZ permission to use their EBT card or authorize the transactions in question at the Costco warehouses in Pacoima, CA or Burbank, CA.

26.  On or about April 9, 2024, according to surveillance
and transaction records from Costco, RAMIREZ used six unique
California EBT cards at four different Costco warehouses
throughout the greater Los Angeles, CA area to conduct
approximately $2,321 in purchases for large amounts of protein
powder.  According to Costco surveillance records, the SUBJECT
VEHICLE was observed on this same date in the parking lot of a
Costco Warehouse in Hawthorne, CA, where RAMIREZ had utilized
three of the six victim EBT cards.

27.  According to California Department of Motor Vehicle
records, the SUBJECT VEHICLE is registered to RAMIREZ at the
SUBJECT PREMISES.

28.  One of the six unique EBT cards used by RAMIREZ to
conduct unauthorized purchased on or about April 9, 2024 is an
EBT card ending in 6364.  This EBT card belongs to victim B.M.
of Alhambra, CA who, according to law enforcement database
queries, was reported as deceased in or about June 2024.

29.  Based on my training and experience conducting access
device fraud investigations, I know that suspects involved in
the unauthorized use of stolen payment card information will
often visit different checkout registers using different payment
cards to avoid using several cards in rapid succession and
drawing unwanted attention to themselves.

30.  Based on a law enforcement database query, I learned
that RAMIREZ was arrested by the Cypress (CA) Police Department
on or about April 26, 2024. This arrest occurred based upon a
victim complaint regarding fraudulent use of their EBT card and

a subsequent interview of RAMIREZ by the Cypress Police
Department.

31.   According to my conversations with officers of the
Cypress Police Department and police reports filed on the victim
complaint and arrest, I know the following:

a.   On or about April 9, 2024, victim S.H. of
Ontario, CA filed a police report with the Cypress Police
Department indicating that her California EBT card ending in
5189 was used without her knowledge or permission for purchases
totaling approximately $4,700 at a Costco warehouse in Cypress,
CA on April 1, 2024. Victim S.H. did not discover these
unauthorized EBT card transactions until she attempted to buy
groceries on or about April 6, 2024 and her EBT card was
declined.

b.   Subsequent investigation by the Cypress Police
Department showed that RAMIREZ had conducted the unauthorized
transactions using S.H.'s California EBT card based upon the
Costco membership profile used for the purchases.

c.   After being contacted by the Cypress Police
Department, RAMIREZ appeared in-person at the Cypress Police
Department station on or about April 26, 2024 to speak with
officers. After being advised of his *Miranda* rights, RAMIREZ
agreed to speak with officers. RAMIREZ, in sum and substance,
admitted to conducting the unauthorized transactions. RAMIREZ
also stated to officers that it was his first time ever doing
anything like this. RAMIREZ said he obtained the EBT card from

an unidentified male he met while working for a food delivery service.

        d.   After admitting to the unauthorized transactions using S.H.'s EBT card, RAMIREZ was arrested for violations of California Penal Code sections 484e(d) and 484g(a). RAMIREZ was later released on bond for this state arrest.

    32.   According to Costco transaction records, RAMIREZ used E.H.'s California EBT card to purchase approximately $4,697 worth of protein powder and Liquid IV.

    33.   According to records from Wells Fargo, RAMIREZ opened a checking account ending in 1781 ("the 1781 account") on or about July 28, 2022 in RAMIREZ's name and using the address of the SUBJECT PREMISES.

    34.   RAMIREZ also opened a business checking account at Wells Fargo ending in 1254 ("the 1254 account") on or about September 9, 2022 under the business name LA Flaming Chicken LLC, which is owned and operated by RAMIREZ according to the articles of incorporation from the State of California. LA Flaming Chicken LLC's articles of incorporation also list the SUBJECT PREMISES as the business address.

    35.   Based upon records from Wells Fargo, the 1781 account and the 1254 account have received approximately $599,200 in deposits from Amazon from on or about July 26, 2023 through on or about June 28, 2024. These deposit descriptions into RAMIREZ's Wells Fargo accounts appear as either "Instant Pmt from AMAZON.COM", or "PAYABILITY EDI PYMNTS". Payability Inc. is an Amazon approved third-party software partner which provides

Amazon sellers with quicker access to their daily funds generated from Amazon sales.

36. Law enforcement has obtained leasing records from the property management company for the SUBJECT PREMISES. According to these records, the SUBJECT PREMISES was originally leased by RAMIREZ's mother, Magdalena Ramirez, in or about 2009.

37. Based upon my conversations with representatives of the property management company for the SUBJECT PREMISES on or about July 2, 2024, I know the following:

a. RAMIREZ has been the primary occupant of the SUBJECT PREMISES for the last several months. While property management has observed RAMIREZ at the SUBJECT PREMISES on a near daily basis, they have not observed RAMIREZ's mother at the SUBJECT PREMISES in the previous few months.

b. Property management for the SUBJECT PREMISES indicated that RAMIREZ drives the SUBJECT VEHICLE but is not assigned a parking space.

c. Property management for the SUBJECT PREMISES has previously spoken with RAMIREZ because RAMIREZ was piling boxes in a shared hallway with other tenants.

d. On or about July 2, 2024, property management for the SUBJECT PREMISES conducted a planned unit inspection on several apartments in the building, including the SUBJECT PREMISES, because the building is currently in escrow to be sold to a different owner. During this inspection, the property management noted that RAMIREZ was the only person present at the SUBJECT PREMISES and that a large number of boxes and shipping

labels were stacked throughout the SUBJECT PREMISES. Property management also noted that, during previous inspections of the SUBJECT PREMISES, the apartment resembled a messy storage unit full of boxes.

38.  Based upon the information obtained by law enforcement from the property management for the SUBJECT PREMISES, evidence obtained to date as outlined in this affidavit, and my training and experience, I believe RAMIREZ is using the SUBJECT PREMISES to store product obtained through the illicit use of victim EBT cards. Based upon the presence of a large number of boxes and shipping labels inside of the SUBJECT PREMISES, RAMIREZ is also likely transporting the fraudulently obtained products in the SUBJECT VEHICLE to ship the products RAMIREZ has sold via Amazon or other sales platforms unknown to law enforcement at this time.

39.  Based upon my training, experience, and participation in this investigation, I also know that RAMIREZ must use electronic devices, such as a computer or cellular phone, to list the product he has illicitly obtained for sale on Amazon or other sales platforms currently unknown to law enforcement.

40.  While it is presently not known to law enforcement, it is likely, based on my training and experience, that evidence obtained from RAMIREZ's electronic devices may show how RAMIREZ is obtaining victim EBT card information from 11 different states to perpetrate the fraud scheme at issue.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

> c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

> d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

> e.   Based on my training, experience, and information
from those involved in the forensic examination of digital
devices, I know that it is not always possible to search devices
for data during a search of the premises for a number of
reasons, including the following:

i.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

ii.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

f.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

i.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To

15

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

ii.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

iii. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RAMIREZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of RAMIREZ's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

g.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

16

## VI. <u>CONCLUSION</u>

42.   For the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1, the person described in Attachment A-2, and the SUBJECT VEHICLE described in Attachment A-3.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
July.


_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE